## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

### JOSEPH DANIEL HALLFORD
### DOB: xx/xx/1981

I, Laura M. Machonis, being first duly sworn, depose and state as follows:

### AFFIANT'S BACKGROUND

1. I am a Special Agent ("SA") of United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), Washington, D.C., and have been so employed since 1992. I am a graduate of the Federal Law Enforcement Training Center ("FLETC"), Glynco, Georgia. At FLETC, I was trained in the area of federal firearms, arson and explosive laws and regulations and have been involved in numerous criminal investigations concerning the aforementioned. I have attended the ATF Advanced Arson and Explosives Investigation School and the ATF Post Blast School, where I received specialized training in the field of arson and explosives investigations. I am currently assigned to the Arson and Explosives Group within the ATF Washington Field Division.

2. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, my review of documentation and publicly-available information, and my conversations with other law enforcement officers. Where the actions, statements, and conversations of others are recounted herein, they are recounted in substance and part, unless otherwise indicated. Where the affidavit contains items in quotation marks, those quotations are based on agent notes and may not be completely verbatim. Because this affidavit is being submitted for the limited purpose of supporting a criminal complaint, I am setting forth only those facts and circumstances necessary to establish probable cause for the issuance of the requested complaint. Unless otherwise indicated, all written and oral statements referred to herein are set forth in substance and in part, rather than verbatim.

### PURPOSE OF AFFIDAVIT

3. This affidavit is in support of a criminal complaint charging **JOSEPH DANIEL HALLFORD ("HALLFORD")**, with having knowingly possessed a firearm, namely a destructive device, not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861, and with having carried, on or about his person within the District of Columbia, in a place other than his dwelling place, place of business or on other land possessed by him, a rifle or shotgun, in violation of 22 D.C. Code § 4504(a-1).

## FACTUAL BASIS SUPPORTING PROBABLE CAUSE

4. On or about Monday, November 4, 2013, HALLFORD, drove his father's red, four-dour 2012 Chrysler, bearing Alabama license plate number xxxxxxx (the "Vehicle"), from his home in Slocomb, Alabama, toward Washington, DC, to participate in a planned protest demonstration and march to be held in front of the White House on November 5. He arrived in DC on the morning of November 5 and participated in the planned event later that day.

5. On or about November 6, at approximately 4:53 AM, a United States Park Police ("USPP") officer found the Vehicle parked on Ohio Drive, S.W., just south of Independence Avenue, S.W. The USPP officer placed an "unattended vehicle" tag on the vehicle. Later that same day, HALLFORD checked himself in at the George Washington University ("GWU") Hospital Emergency Room in Northwest DC, complaining of internal bleeding and pain. While there, HALLFORD was "aggressive toward staff," threatened to cause physical harm to members of the staff, and indicated that he had come to DC to provoke the United States Secret Service ("USSS") to shoot him. Based on his statements and overall conduct, he was involuntarily committed for emergency observation and diagnosis for a potential mental illness and transferred to the United Medical Center ("UMC") in Southeast DC.

6. On November 6, the USSS was also notified of HALLFORD's statements. That evening, two Special Agents with the USSS went to UMC to attempt to interview HALLFORD about his statements. Upon coming into contact with HALLFORD (who was lying unrestrained in a hospital bed), the USSS Special Agents identified themselves to HALLFORD, advised him that he was not under arrest or in any trouble, and asked him if they could speak with him further about some alleged statements he had made about the USSS. HALLFORD assented to answering the agents' questions and a noncustodial interview began. During the interview, HALLFORD stated, among other things, that he had come to DC to provoke USSS personnel to shoot him in the chest and effectively commit suicide so that his parents could "own" the agency. HALLFORD further stated that he had attended a protest in front of the White House on November 5 and attempted to provoke USSS personnel by yelling, "Shoot me, shoot me." HALLFORD stated his attempt failed because he was unarmed. When later questioned about his ownership of any weapons, HALLFORD admitted to the USSS Special Agents that he did own some. HALLFORD initially indicated that the weapons were located at his home in Alabama, but later corrected that statement and acknowledged that the weapons were in a vehicle he had driven to DC (i.e., the Vehicle). HALLFORD also told the agents that if they looked in the Vehicle, they would find some "bad things" there, including multiple firearms and a "Molotov cocktail." HALLFORD stated that the Molotov cocktail in the Vehicle was for "protection against gangs in Alabama." When the agents asked HALLFORD where the car was located in DC, HALLFORD stated that he did not recall exactly where he parked the Vehicle or its license tag number. HALLFORD did, however, indicate that the Vehicle was his father's.

7. After interviewing HALLFORD, the USSS Special Agents contacted HALLFORD's

father by telephone and obtained additional descriptive information for the Vehicle, including the color, make and model, and license plate number of the car. The USSS thereafter relayed the Vehicle's identifying information to various law enforcement agencies in DC and VA in an effort to locate the vehicle.

8. On November 6, at approximately 7:50 PM, USPP Communications issued a radio broadcast over law enforcement channels to be on the lookout for the Vehicle. A USPP officer recognized the lookout description as matching that of the Vehicle, which had been tagged as an "unattended vehicle" earlier that day (see paragraph 5 above). The USPP officer went to the location of the Vehicle and positively identified it as being the subject of the lookout. The USPP officer requested assistance from the Metropolitan Police Department's Explosive Ordnance Destruction unit ("MPD EOD") because the Vehicle was parked in close proximity to the Lincoln Memorial, and there was a large volume of both pedestrian and vehicle traffic in and around the immediate area of the Vehicle. MPD EOD secure perimeter was established around the car. Around the same time, a USSS Special Agent contacted HALLFORD's father again and obtained consent to search the Vehicle for weapons or other evidence of criminal violations.

9. On the evening of November 6, 2013, MPD EOD made entry into the Vehicle. The following items were found inside a suitcase on a rear passenger seat of the vehicle:

- A brown glass Worcestershire bottle containing, among other things, a firework, several unlit matches, Q-tips coated in a black substance, Styrofoam, an assortment of metal pieces, a "live" round of .22 caliber ammunition, and a rag protruding from the top (i.e., a suspected Molotov cocktail); and

- One .45 caliber semi-automatic AMT pistol with one round in the chamber and four rounds in an affixed magazine

The following items were found in the trunk of the vehicle:

- One black 12-gauge Mossberg Maverick 88 shotgun with a nine-pellet 00 buck round in the chamber, 14 rounds in the chamber, and a tactical light affixed to the barrel;

- One black, .22 caliber Marlin 60 rifle with one round in the chamber and 14 rounds in an inserted magazine;

- One black .22 caliber Mossberg 702 Plinkster rifle with one round in the chamber and 10 rounds in an inserted magazine;

- One large, clear ziplock bag marked "#1 Ultra Fast DEATH Remington .22 Yellow jacket HP + Gold Plated HP" containing .22 LR caliber ammunition;

- One large, clear ziplock bag marked "Military Grade 12 gauge buck shot" containing four boxes of 12-gauge 00 buck shells, one of which was labeled

3

"Joseph Hallford";

- One large, clear ziplock bag marked "#2 HP .22 Lead Death at Speed Next to Fastest," containing two boxes of .22 LR caliber ammunition;

- One large, clear ziplock bag marked "#3 Gold .22 Std Non-Hollow Point Medium Death," containing two boxes of .22 LR caliber ammunition;

- One medium, clear ziplock bag marked "#4 lead .22 standard (Not Hollow point) Slow Death," containing three boxes of .22 LR caliber ammunition and numerous loose ammunition rounds;

- One box of PMC Bronze .45 caliber ammunition, containing 39 rounds;

- One yellow plastic bag containing 20 rounds of green-tipped .223 caliber ammunition and one round of red-tipped .223 ammunition;

- Three boxes of Coleman brand waterproof matches;

- One five-gallon, plastic, gasoline canister with a small amount of liquid, later identified as gasoline;

- One camouflage soft body armor vest;

- One black and silver hatchet;

Also found inside the passenger compartment of the vehicle were three separate receipts, indicating that the shotgun and two rifles had been purchased from three separate locations in early October 2013.

10. The USPP later transferred the components of the suspected Molotov cocktail, including the plastic gasoline container with liquid, to the ATF forensics evidence laboratory for further analysis.

11. The ATF has examined the components of the suspected Molotov cocktail and determined that they constitute a combination of parts either designed or intended for use in converting any device into a "destructive device," as defined in 26 U.S.C. § 5845(f), and from which a "destructive device" may be readily assembled. HALLFORD has not registered or attempted to register any "destructive devices" with the National Firearms Registration and Transfer Record. Accordingly, HALLFORD's possession of the above-referenced components violates 26 U.S.C. § 5861(d).

12. The DC Firearms Registration Business Services Division has been contacted to ascertain whether HALLFORD has ever applied for or received a license or registration to carry a 12-gauge Mossberg Maverick 88 shotgun, .22 caliber Marlin 60 rifle, or .22 caliber Mossberg 702 Plinkster rifle. HALLFORD has never applied for or received a license or

4

registration from the DC Firearms Registration Business Services Division to carry a 12-gauge Mossberg Maverick 88 shotgun, .22 caliber Marlin 60 rifle, or .22 caliber Mossberg 702 Plinkster rifle. Each of these firearms, as well as the .45 caliber semi-automatic AMT pistol found in the Vehicle, has been test-fired and determined to be operable.

## CONCLUSION

13. Based on the abovementioned facts, I submit there is probable cause to believe that on or about November 6, 2013, within the District of Columbia, HALLFORD knowingly possessed a firearm, namely a destructive device, not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861, and knowingly carried on or about his person in a place other than his dwelling place, place of business or on other land possessed by him, a rifle and shotgun, in violation of 22 D.C. Code § 4504(a-1).

_____
Laura Machonis, Special Agent
Department of Justice
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Subscribed and sworn before me this_____day of November, 2013.

_____
Alan Kay
United States Magistrate Judge